UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal Number: 09-CR-10054 (MLW) |
| HUMZA ZAMAN | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

Sentencing Recommendation

Humza Zaman laundered a significant quantity of proceeds, approximately $600,000 to $800,000, for Albert Gonzalez, a major computer hacker and identity thief. For this conduct, Zaman should be sentenced to 46 months' incarceration, three years' supervised release, and a $75,000 fine.

The Scope of Zaman's Criminal Conduct

The Gonzalez Organization

The Gonzalez organization, of which Zaman was a part:

1. Hacked into numerous businesses' wireless computer networks and databases;

2. Unlawfully accessed the computer networks that processed credit and debit card transactions for BJ's Wholesale Club, DSW, OfficeMax, Sports Authority and TJX Companies, among other companies;

3. Stole from the networks the track 2 data (the data encoded on the magnetic stripes on the backs of credit and debit cards read by ATM machines and credit card readers) pertaining to tens of millions of credit and debit card transactions;

4. Enlisted a person in a former Soviet republic to decrypt encoded PIN numbers;

5. Sold some track 2 data in the United States and Eastern Europe for fraudulent use;

6. Used other track 2 data directly to withdraw large sums from banks' ATM machines; and

7. Finally, used sophisticated techniques to launder their proceeds through surrogates, anonymous web currencies, and Latvian bank accounts in the names of shell corporations.

Zaman's Role

Zaman's principal involvement occurred during the money laundering stage of the operation. Gonzalez often directed that he be paid in a digital currency exchanged electronically over the Internet or by a wire transfer to a bank account in Latvia. Gonzalez therefore needed to repatriate these payments, convert them to untraceable American currency, and to have the currency shipped anonymously back to him. Zaman's job was to get the proceeds back to Gonzalez once the proceeds had been repatriated.

Between approximately November 21 and November 25, 2005, Zaman used ATM cards linked to accounts in the names of fictitious or unrelated individuals to withdraw and repatriate from Latvia approximately $38,000 of Gonzalez's funds, and sent the money in cash, minus a cut, to Gonzalez in Miami.

In late 2005 and early 2006, Zaman traveled to California at Gonzalez's direction on approximately three occasions. There, he met with an unknown man of apparent Eastern European descent. On each occasion, Zaman picked up between $50,000 and $370,000 in currency.[1] Zaman then put the currency, minus his cut, in Federal Express boxes and shipped the money using a fictitious name to Gonzalez in Miami. Roughly contemporaneously, Zaman also picked up money for shipment to Gonzalez on approximately three occasions in New York. On each occasion, Zaman picked up and shipped less than $100,000, but the exact amount is unknown. For his efforts, Zaman received a 10% cut of the money he picked up and shipped.[2]

In the first half of March 2008, Zaman also sent Gonzalez ATM system logs from Barclays bank, where Zaman was then employed as a programmer, to see whether and of what value they could be to the conspirators. Although Gonzalez uploaded these logs to a Latvian computer server shared by the conspirators, as of the date of this filing the government is not aware of any further misuse of these logs.

---

[1] Zaman admitted in a pre-charge interview to making three trips to San Francisco and picking up $100,000 and $250,000 each time. Gonzalez could not recall the precise number of Zaman's trips, but stated that Zaman made fewer than five, each time picking up between $50,000 and $300,000. A logged Internet chat session between Gonzalez and Zaman indicates that $370,000 was available for Zaman to pick up on at least one of these trips.

[2] The government does not know precisely the total amount of money Zaman laundered. The government's approximation of $600,000-$800,000 is based on the evidence summarized above, as is the government's proposed fine of $75,000, intended to disgorge his 10% cut.

The Basis of the Government's Sentencing Recommendation

Zaman was part of an organization that committed computer crimes and identity thefts on an unprecedented scale.[3] To function as efficiently, surreptitiously, and profitably as it did over five years, the organization had to launder and move the proceeds of its criminal activities. Zaman's secretive collection and transmission of criminal proceeds was critical to the organization's ultimate purpose of obtaining money from computer hacking and identity theft.

Zaman incontrovertibly knew that Gonzalez was a major hacker who profited handsomely from identity theft from major corporations. Zaman even sent him ATM logs from his own employer, Barclays bank, to see if Gonzalez could profit from them. However, the government has no evidence that Zaman participated in, or reasonably foresaw the extent of, the intrusions and data thefts perpetrated by the Gonzalez organization. As a consequence, it would be inappropriate pursuant to U.S.S.G. §1B1.3(a)(1)(B) to predicate his sentence on the core of the organization's criminal activities. Rather, he should be held fully and squarely accountable for his knowing and significant role in laundering proceeds of the organization's massive identity thefts.

Zaman has not objected to Probation's calculation of the Sentencing Guidelines range of 46-57 months, based upon a total offense level of 23 and a criminal history category of I. The Sentencing Guidelines range strikes a fair balance in this case. Zaman's criminal conduct, and

---

[3] Millions of citizens were victimized as their credit and debit card numbers were stolen. The United States Secret Service has recovered 27.5 million credit and debit card numbers from one of the computer servers utilized by Gonzalez's group, situated in the Ukraine, and 16.3 million payment card numbers from a second server, located in Latvia. While there was a modest overlap between the stolen payment card numbers stored on the two servers, the organization's Ukrainan and Latvian computer server stored over 40,000,000 distinct stolen payment card numbers.

the factors to be considered when sentencing him for that conduct, fall within the heartland of that range. "[The Sentencing] Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.' " Kimbrough v. United States, 552 U.S. 85, 109 (2007) (quoting Rita v. United States, 551 U.S. 338, 350 (2007))

Zaman's background, as related in the Presentence Report, does not justify a deviation from the advisory Guidelines range.  His background has many of the earmarks of healthy childhood, sought-after opportunity and white-collar success.  As a child he read a lot, had lots of friends, and was a member of the chess, debate and math clubs.  As an adult, he progressed through a series of jobs with increasing responsibility and more than quadrupled his yearly salary from approximately $30,000 per year to $130,000 (plus bonus) between 1999 and the time of his arrest.  But, he enjoyed partying and using expensive recreational drugs when he wasn't working.  So he needed cash beyond his six-figure legitimate income. And, for this, he actively helped launder approximately $600,000-$800,000 of the Gonzalez organization's criminal proceeds for a cut of the action.

Zaman's advisory Sentencing Guidelines range is 46-57 months. Within that range, the government recommends that the Court impose a sentence at the low end.  Although Zaman did not provide substantial assistance in the investigation or prosecution of another, he did disclose to the government facts concerning his own involvement in the conspiracy.[4]

---

[4] Two other members of the organization have either entered into a binding plea with the government or been sentenced.  Albert Gonzalez was the group's central figure.  He has entered into a plea agreement with the Government pursuant to Fed. R. Crim. P. 11(c)(1)(C) under which he will be sentenced to between 15 and 25 years' incarceration, if accepted by the Court. Stephen Watt provided a critical piece of malicious software to Gonzalez, for which he claimed he was not paid.  The government recommended that Watt be sentenced to 60 months' incarceration; he was sentenced to 24 months' incarceration by Judge Gertner.

Conclusion

For the reasons set forth above, the Court should sentence Humza Zaman to 46 months' incarceration, three years' supervised release, a $75,000 fine and impose the mandatory special assessment of $100.[5]

>                              Respectfully submitted,
>
>                              CARMEN M. ORTIZ
>                              United States Attorney
>
>                        By:   /s/ Stephen P. Heymann
>                              STEPHEN P. HEYMANN
>                              Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

>                              /s/ Stephen P. Heymann
>                              STEPHEN P. HEYMANN
>                              Assistant U. S. Attorney

Date: January 31, 2010

---

[5] The government is not seeking restitution in this matter because it cannot identify the particular victim(s) associated with the money laundered by Zaman.  See U.S.S.G §5E1.1(a) (requiring restitution in cases where there are identifiable victims); 18 U.S.S.G. § 3663(a)(1)(B)(ii)(excusing restitution where the complication or prolongation of the sentencing process resulting from the fashioning of an order of restitution outweighs the need to provide restitution).