1                   UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              No. 1:09-cr-10054-MLW-1

4

5

   UNITED STATES OF AMERICA
6

7   vs.

8

   HUMZA ZAMAN
9

10

11                       * * * * * * * * *

12

                          For Hearing Before:
13                    Chief Judge Mark L. Wolf

14

15                          Plea Change

16

17                   United States District Court
                     District of Massachusetts (Boston.)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   April 28, 2009

20

21                       * * * * * * * *

22

                  REPORTER: RICHARD H. ROMANOW, RPR
23                     Official Court Reporter
                    United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
                     bulldog@richromanow.com
25

```
 1                    A P P E A R A N C E S

 2

 3    STEPHEN P. HEYMANN, ESQ.
         United States Attorney's Office
 4       John Joseph Moakley Federal Courthouse
         1 Courthouse Way, Suite 9200
 5       Boston, MA 02210
         (617) 748-3100
 6       Email: Stephen.heymann@usdoj.gov
         For the United States
 7

 8    PATRICK J. BRACKLEY, ESQ.
         Law Office of Patrick J. Brackley
 9       233 Broadway, Suite 801
         New York, NY 10279
10       (212) 334-3736
         Email: Patrickbrackley@aol.com
11    and
      PETER C. HORSTMANN, ESQ.
12       Law Office of Partridge, Ankner & Horstmann, LLP
         200 Berkeley Street, 16th Floor
13       Boston, MA 02116
         (617) 859-9999
14       Email: Pete@horstmannlaw.com
         For the defendant
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2              (Begins, 4:45 p.m.)
 3              THE CLERK:  Criminal Matter 09-10054, the
 4   United States versus Humza Zaman.  The Court is now in
 5   session.  You may be seated.
 6              THE COURT:  Good afternoon.  Would counsel
 7   please identify themselves for the Court and for the
 8   record.
 9              MR. HEYMANN:  Your Honor, I'm Steve Heymann on
10   behalf of the government.
11              MR. BRACKLEY:  Patrick Brackley,
12   B-R-A-C-K-L-E-Y, 233 Broadway, New York, admitted to
13   this Court pro hac vice --
14              THE COURT:  Not yet.
15              MR. BRACKLEY:  Not yet.  I'm for the
16   defendant, Judge, Mr. Zaman.
17              THE COURT:  There's a motion.  I haven't acted
18   on the motion yet.
19              MR. HORSTMANN:  Judge Dein did act on it this
20   afternoon, your Honor.
21              THE COURT:  That's news to me.  Okay.  It
22   appears to be in order.  And did she set conditions of
23   release as well?
24              MR. HEYMANN:  Yes, she did, your Honor.
25              THE COURT:  All right.  What are those
```

1    conditions?

2         MR. HEYMANN:  Those conditions are $100,000

3    bond, unsecured.  Reporting three times a week to

4    Pretrial Services, I believe, once in person.  Random

5    drug testing.  Turning in his passport.  And travel

6    restricted to New York, where he resides, and

7    Massachusetts, where the court is, um, absent further

8    motion to the Court.  Plus, the standard and mandatory

9    conditions.

10        THE COURT:  Okay.  And, as I understand it,

11   the defendant wants to waive indictment and plead guilty

12   to the one-count conspiracy information, is that right?

13        MR. BRACKLEY:  That's correct, your Honor.

14        THE COURT:  All right.  And, Mr. Heymann, I'd

15   appreciate it if you'd give me an overview of this

16   case.  There are many, many objects of the conspiracy

17   charged and there are no co-conspirators charged in this

18   case.  Well, perhaps they had been before other judges.

19   But what's this about?

20        MR. HEYMANN:  If I may, your Honor, what I

21   think what would be helpful is to, first of all, give

22   you a broad picture of the varies other courts and then

23   the statement of facts itself will give you his role

24   within the conspiracy.

25        There are, in fact, five, I believe, separate

1    proceedings in this district right now.  There is the

2    principal case, as I'll call it, against the defendant,

3    Albert Gonzalez, who I refer to, in the statement of

4    facts, who was the primary motivating force of the --

5    among other things, intrusion into or data theft from

6    TJMax.  There are separate cases in front of Judges

7    Woodlock, Young, Gertner, and Bowler relating to

8    co-defendants because they were charged by information

9    and drawn to separate judges.

10              THE COURT:  Why weren't the co-conspirators

11   charged together?

12              MR. HEYMANN:  It was the way -- what happened

13   was that the, um -- each judge -- well, let's see.

14   Christopher Scott and Patrick Tuey agreed to plead

15   guilty and cooperate with the government prior to the

16   charging of Albert Gonzalez and then we developed

17   additional information that led us to the position that

18   we could charge co-defendants Watt, Zaman and Jethro

19   leading to sequential separate charges.

20              THE COURT:  Why not superseding indictments so

21   that one judicial officer would have a panoramic view of

22   the case and an understanding of the relative roles of

23   the defendants?

24              MR. HEYMANN:  Well, with respect to the

25   relevant roles of the defendants, it has been the

```
 1   practice of the government, in each of these cases, to

 2   ensure that there was a common statement of facts that

 3   went, as part of the sentencing proceedings, um,

 4   relating to all of the various roles that are charged

 5   and the various people within those roles.  It was

 6   simply the mechanics -- unfortunately the mechanics of

 7   the local rules, and if I may address those briefly,

 8   which simply do not allow consolidation in criminal

 9   cases in the way they do in civil cases.

10           THE COURT:  They don't allow consolidation,

11   but they permit superseding indictments.

12        The newspapers report you indicted Diane Wilkerson

13   and then -- well, you superseded -- you didn't, you

14   brought an information, then you indicted her, then you

15   brought an information against Chuck Turner, and then

16   you superseded the Wilkerson indictment and included

17   Turner.  Am I correct?

18           MR. HEYMANN:  I don't know the answer, your

19   Honor.  I'm not participating in the Wilkerson

20   proceeding.  I know of it, but --

21           THE COURT:  I think it can -- Judge Woodlock

22   would say, you know, "Do you believe in infant

23   baptism?"  "Do I believe in it?  I've seen it."  I think

24   it can be done.  But anyway, it wasn't done here.

25           MR. HEYMANN:  It wasn't done here.  If I can
```

1    then if the -- if the Court so desires, I'll give the

2    government's statement of facts in brief, which will

3    explain his role within the conspiracy first, the first

4    few minutes of which describe the overall conspiracy and

5    then later his role.

6         Between approximately 2003 and 2007, a group led

7    by Albert Gonzalez electronically broke into a number of

8    large retailers' computer networks and including one

9    belonging to OfficeMax.  They would drive, scanning the

10   airways and shopping strips in Miami, from their cars,

11   looking for potentially vulnerable wireless access

12   points.  When they found one, they would park in

13   adjacent lots or sit nearby in rented rooms with laptop

14   computers until they were able to compromise the

15   perimeter of the retailer's computer network.  Once

16   inside, they would search the network for credit and

17   debit card information either in storage or traveling

18   across the network in an unencrypted state.

19        Gonzalez sold much of the credit card information

20   on line through different elicit vendors.  He also

21   provided portions to co-conspirators who used the stolen

22   payment card information to imprint blank cards and

23   withdraw hundreds of thousands of dollars from victims'

24   accounts through ATM machines.  In each instance,

25   Gonzalez, often directed that he be paid in an

1   off-shore-based internet currency or by wire transfer to

2   a bank account in Latvia.  The task then was to

3   repatriate that money, convert it to untraceable

4   currency, and ship the currency anonymously back to

5   Gonzalez.

6        That's where the defendant's role comes in.  At

7   the end of 2005 and in the beginning of 2006, Humza

8   Zaman traveled to California on Albert Gonzalez's

9   direction on at least three occasions.  There he met

10  with an unknown man of apparent Eastern European

11  descent.  On each occasion, Zaman picked up between

12  50,000 and $300,000 in currency.  Zaman then put the

13  currency in Federal Express boxes and shipped the money,

14  using a fictitious name, to Gonzalez in Miami.  Zaman

15  also picked up money for shipment to Gonzalez on

16  approximately three occasions in New York, but each of

17  these were for significantly lesser amounts of money.

18  For his efforts, Gonzalez paid Zaman approximately 10

19  percent of the money he picked up and shipped.

20             THE COURT:  Which comes to about how much?

21             MR. HEYMANN:  We do not have a precise amount

22  of shipment.  The shipment was -- because there were no

23  records kept from which we can draw.  It was between --

24  the shipment was between 300 and $750,000,

25  approximately, which would make 10 percent between 30

```
 1    and $75,000 in payments.
 2              THE COURT:  And you're not bound by this, but
 3    what do you think -- well, would the guidelines be based
 4    on what the defendants received at 30 or 70,000 or some
 5    larger number because of the scope of what the
 6    government will argue was a conspiratorial agreement?
 7              MR. HEYMANN:  I believe, your Honor, that
 8    the -- um, I think I have to address that in two parts.
 9    I think he is bound by the broader conspiratorial
10    agreement, but I think the broader conspiratorial
11    agreement, um, as it existed when he was active, does
12    not encompass the entirety of TJX that our best figure,
13    as a result for approximating his role, is the amount of
14    money he himself transferred and was involved in
15    transferring, being the 300 to $750,000, and that, to
16    take it to the last step, that as a result his guideline
17    range, with acceptance of responsibility, would be
18    somewhere between 37 and 46 months.  But that the figure
19    appropriate, as the best approximation we have of his
20    role in the conspiracy, is the 300 to $750,000 figure.
21              THE COURT:  But I'm not bound by that figure
22    if it looks different to me at sentencing, correct?
23              MR. HEYMANN:  That is correct, your Honor.
24              THE COURT:  Okay.  Does somebody have a
25    waiver-of-indictment form to be signed?
```

1          MR. HEYMANN:  Yes, I believe he's already

2     signed a waiver-of-indictment form and he has it there.

3     But I have another copy of it.

4          THE COURT:  Well, I'm going to have to ask him

5     a series of questions to see whether it's accepted.  But

6     if I'm persuaded it's appropriate, then I'll need to

7     sign the form.

8          All right.  The defendant should approach the

9     witness stand and be sworn, please, and counsel can go

10    with him ideally with a copy of the information and the

11    plea agreement.

12          (THE DEFENDANT, sworn.)

13          THE COURT:  Would you please state your true

14    full name.

15          THE DEFENDANT:  Humza Zaman.

16          THE COURT:  And do you understand that you've

17    just taken an oath to answer the questions I'm going to

18    ask you truthfully and any failure to do that could be a

19    separate prosecutable criminal offense?

20          THE DEFENDANT:  I do, your Honor.

21          THE COURT:  Do you also understand that if

22    you're confused by any of my questions or unsure about

23    what an honest or accurate answer would be, I'll give

24    you a chance to talk to your attorney so we can clear up

25    any confusion and so you can give me a reliable

```
 1   response?
 2              THE DEFENDANT:  Thank you, your Honor.  Yes.
 3              THE COURT:  Okay.  How old are you?
 4              THE DEFENDANT:  32.
 5              THE COURT:  Where were you born?
 6              THE DEFENDANT:  New York.
 7              THE COURT:  How far did you go in school?
 8              THE DEFENDANT:  Um, college.  Some college.  I
 9   went to some colleges.
10              THE COURT:  Okay.  You're going to have to
11   keep your voice up.
12         Do you have any trouble understanding or speaking
13   English?
14              THE DEFENDANT:  No.
15              THE COURT:  Are you today under the influence
16   of any drug, medication or alcohol?
17              THE DEFENDANT:  No.
18              THE COURT:  Have you ever been treated for
19   mental illness or drug addiction?
20              THE DEFENDANT:  Um, I did like a one-day drug
21   program in New York five years ago.
22              THE COURT:  Okay.  Have you retained an
23   attorney in this case?
24              THE DEFENDANT:  I have.
25              THE COURT:  And do you have a copy of the
```

1    information charging you with conspiracy?

2              THE DEFENDANT:  I do, your Honor.

3              THE COURT:  Do you understand that the charge

4    against you is a charge that's punishable by more than

5    one year in prison and therefore is a Federal felony?

6              THE DEFENDANT:  I do.

7              THE COURT:  And did you read that conspiracy

8    charge in the information against you?

9              THE DEFENDANT:  I did.

10             THE COURT:  Did you discuss it with your

11   attorney?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  Do you understand that when a

14   Federal felony like this one is involved, you have a

15   right to be charged by a grand jury rather than in an

16   information issued by the United States Attorney's

17   Office, like this one?

18             THE DEFENDANT:  I do.

19             THE COURT:  Do you understand that the grand

20   jury is made up of 16 to 23 people and at least 12 of

21   them would have to find there's probable cause to

22   believe you committed the crime for you to be indicted

23   and charged by the grand jury?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  Do you understand that if this

1    matter is presented to a grand jury, it might or might

2    not return an indictment against you?

3              THE DEFENDANT:  I do, your Honor.

4              THE COURT:  Do you understand that if I accept

5    your waiver of indictment, this case will proceed based

6    on this information just as if you had been charged by

7    the grand jury in an indictment?

8              THE DEFENDANT:  I do, your Honor.

9              THE COURT:  Have you talked with your lawyer

10   about whether you would like to waive indictment?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Are you fully satisfied with his

13   work on your behalf?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Do you have there a copy of the

16   letter dated February 17, 2008 to Mr. Brackley from the

17   United States Attorney's Office?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Is that your plea agreement with

20   the government?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  I'll mark it Exhibit 1 of today's

23   date.

24        Did you sign that agreement on the last page?

25             THE DEFENDANT:  I have, your Honor.

1          THE COURT:  Did you read the agreement before

2    you signed it?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Did you discuss it with

5    Mr. Brackley before you signed it?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Did you feel you understood that

8    letter before you signed it?

9          THE DEFENDANT:  Yeah.  Yes, your Honor.

10          THE COURT:  Does that letter both accurately

11    and completely describe your agreement with the

12    government?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Has anybody made any promises to

15    you or given you any assurances that are not in that

16    letter?

17          THE DEFENDANT:  No.

18          THE COURT:  Has anybody threatened you or

19    tried to force you to plead guilty?

20          THE DEFENDANT:  No.

21          THE COURT:  Do you understand that, on Page 4

22    of that letter, you're giving up certain rights you

23    would ordinarily have to appeal or otherwise challenge

24    decisions in this case?

25          THE DEFENDANT:  Yes, your Honor.

 1              THE COURT:  Specifically do you see that
 2     you're giving up any right to challenge your conviction
 3     or your sentence within the statutorily-authorized
 4     range?  Well, I'm going to have to see what that means.
 5          When you say "statutorily-authorized range," do
 6     you mean that's below the statutory maximum?
 7              MR. HEYMANN:  Yes, your Honor.
 8              THE DEFENDANT:  What is the statutory
 9     maximum?
10              THE COURT:  We're going to get to that.  Well,
11     the statutory maximum is -- well, it should be in
12     Paragraph 1 on Page 1.  The maximum penalty of 5 years
13     in prison, 3 years of supervised release, and
14     restitution of what amount?
15              MR. HEYMANN:  Again, your Honor, the best
16     approximation was 300 to $750,000.
17              THE COURT:  Restitution of up to $750,000.  Do
18     you understand that?
19              THE DEFENDANT:  Yes, your Honor.
20              THE COURT:  Do you understand that you could
21     also be fined up to $250,000?
22              THE DEFENDANT:  Yes, I read that.  Yes, your
23     Honor.
24              THE COURT:  Do you understand that "supervised
25     release" means that when you're released from prison,

```
 1    you'll be under the supervision of the Probation
 2    Department and if you violate any of the conditions of
 3    your supervised release, you can be locked up again for
 4    up to 3 years in this case?
 5              THE DEFENDANT:  Yes, your Honor.
 6              THE COURT:  Going back to the appellate rights
 7    on Page 4.
 8         Do you understand that you do -- you would still
 9    have the right to appeal any sentence based on the
10    contention that I, in a legally and correct way,
11    calculate the guideline range that would be the starting
12    point, but not the ending point for determining your
13    sentence?
14              THE DEFENDANT:  Yes, your Honor.
15              THE COURT:  And have you talked with
16    Mr. Brackley specifically about whether you want to give
17    up these rights of an appeal?
18              THE DEFENDANT:  Yes, your Honor.
19              THE COURT:  And is that something you want to
20    do?
21              THE DEFENDANT:  Um, yes, your Honor.
22              THE COURT:  Have you also talked to him about
23    whether you want to give up your right to be -- to have
24    this matter presented to a grand jury and have it
25    proceed based on the information?
```

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  All right.  And is that what you

3   want to do?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Then I'll accept your waiver of

6   indictment because I find you're competent, you're

7   effectively represented, and you're acting knowingly and

8   voluntarily.

9      Would you like this information read to you or do

10  you want to waive the reading of the information?

11          THE DEFENDANT:  Yes, I'll waive the reading.

12          THE COURT:  And how would you like to plead,

13  guilty or not guilty?

14          THE DEFENDANT:  Guilty.

15          THE COURT:  Then we'll move to the -- I'll ask

16  you some more questions to determine whether I should

17  accept your guilty plea.

18      Do you understand that if I accept your guilty

19  plea, you'll become a Federal felon and you may lose

20  certain rights, including the right to vote, to hold

21  public office, to serve on a jury, and to possess a

22  firearm?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And do you understand that if you

25  were not a United States citizen, you would also be

```
1    subject to deportation?

2              THE DEFENDANT:  Okay.

3              THE COURT:  Do you understand that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Do you understand that the

6    sentencing, in this case, will be governed by the

7    Advisory Guideline System that is now in effect in

8    Federal court?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Have you talked with Mr. Brackley

11   about how that system might operate in your case?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  Do you understand, however, that,

14   as we sit here today, neither Mr. Brackley nor the

15   prosecutor nor anybody else can tell you with certainty

16   what the guideline range is for your sentence or what

17   sentence I will impose, because until I conduct the

18   sentencing hearing I cannot make those decisions

19   myself?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Do you understand that, in unusual

22   cases, I have the power to give a sentence that's higher

23   or lower than the guideline range, but in most cases, I

24   find that it's most appropriate to give a sentence that

25   is within the guideline range?
```

1            THE DEFENDANT:  Yes, your Honor.

2            THE COURT:  Do you understand that while

3 you've given up certain of your rights to appeal, the

4 government hasn't given up any of its rights to appeal?

5            THE DEFENDANT:  Um, yes.  Um, meaning another

6 judge could change your sentence?

7            THE COURT:  If the government -- well, if the

8 -- yeah, I want to explain this to you.

9        Under your -- do you understand that, under your

10 plea agreement, you've given up your right to appeal my

11 sentence except based on an argument that I incorrectly

12 calculated the guideline range?

13            THE DEFENDANT:  Right.  Yes.

14            THE COURT:  Do you understand, however, that

15 the government has a right to appeal my sentence?

16            THE DEFENDANT:  Yes, your Honor.

17            THE COURT:  And do you understand that that

18 means that if the government is unhappy with the

19 sentence I give you and believes or wants to argue that

20 I made a legal error in giving that sentence, it could

21 appeal, and if my decision was reversed, you would be

22 sentenced again probably by another judge?

23            THE DEFENDANT:  Yes, your Honor.  I

24 understand.

25            THE COURT:  Do you understand that there's no

1    parole in the Federal system, so if I sentence you to

2    prison, you will have to serve substantially all of that

3    time in prison?

4              THE DEFENDANT:  Yup.  Yes, your Honor.

5              THE COURT:  Do you understand that if I give

6    you a sentence that's higher than you hoped for or even

7    higher than the government recommends, that won't be a

8    reason permitting you to withdraw your plea?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Do you understand that you still

11   have a right, if you want to use it, to have your case

12   decided by a jury at a trial?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  And do you understand that if we

15   had a trial, you would have a right to an attorney and

16   if you couldn't afford an attorney, one would be

17   appointed to represent you at public expense?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Do you understand that if we had a

20   trial, you would be presumed innocent, you would not

21   have to prove you were innocent, rather the government

22   would have to prove you were guilty beyond a reasonable

23   doubt to achieve your conviction?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  Do you understand that if we had a

1    trial, you would have an opportunity, through your

2    lawyer, to object to the government's evidence and

3    challenge its witnesses?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Do you understand that you would

6    also, at a trial, have an opportunity, but not an

7    obligation to present a defense including an opportunity

8    to compel witnesses to come testify and documents to be

9    produced?

10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  Do you understand that at any

12   trial you would also have an opportunity, but not an

13   obligation, to testify yourself and if you decided not

14   to testify, I would instruct the jury that it could draw

15   no suggestion that you were guilty from your decision

16   not to testify?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  And do you understand that if I

19   accept your plea of guilty, you'll be giving up your

20   right to a trial and there will be no trial?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  All right.  Now, do you understand

23   that the information in this case charges you with

24   engaging in a conspiracy in violation of 18 United

25   States Code, Section 371, and that allegedly was a

1    conspiracy to achieve or to violate several Federal

2    laws?

3         THE DEFENDANT:  Yes, sir.

4         THE COURT:  And do you understand that to

5    prove a conspiracy, or the conspiracy charged in this

6    case, the government would have to prove beyond a

7    reasonable doubt, first, that the agreement described in

8    the indictment, and not some other agreement, existed

9    between at least two people; second, that you willfully,

10   that is, intentionally and knowing it was illegal,

11   joined in that agreement; and, third, that one of the

12   co-conspirators committed an overt act during the period

13   of the conspiracy and that is an act intended to

14   accomplish at least one of the goals of the conspiracy.

15   Do you understand that?

16        THE DEFENDANT:  Yes.

17        THE COURT:  And then do you understand the

18   Government would have to prove that one of the alleged

19   goals, not all of the alleged goals of the alleged

20   conspiracy existed?

21        THE DEFENDANT:  Yes.

22        THE COURT:  And it's alleged that one goal of

23   the conspiracy was the unlawful access of computers in

24   violation of Section 1030(a)(2)(C) of the United States

25   Code, that is, by means of interstate communications,

1    "Intentionally accessing, without authorization,

2    computers which were used in interstate commerce and

3    thereby obtaining information from those computers,

4    including credit and debit card information, for the

5    purpose of commercial advantage and private gain."

6         Do you understand that that's one of the alleged

7    goals of the conspiracy?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  And do you understand that to

10   prove that -- an agreement to commit that crime, the

11   government would have to prove an agreement to

12   intentionally access a computer, without authorization,

13   to obtain information from that computer to be used for

14   commercial advantage or for financial gain, and the

15   access of the computer had to involve communications

16   between one state or another state or the United States

17   and a foreign country.  Do you understand that?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Do you understand that?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Speak into the microphone, please.

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  Then a second alternative goal of

24   the alleged conspiracy was access device fraud in

25   violation of 18 United States Code, Section 1029(a)(3).

1    It is charged here:  "Knowingly, and with intent to

2    defraud, possessing at least 15 unauthorized access

3    devices, particularly stolen credit and debit card

4    use."

5         Do you understand that to prove a violation of

6    Section 1029(a)(3), the government would have to prove

7    beyond a reasonable doubt that one of the -- well, the

8    co-conspirators sought to use -- I'm sorry, to possess

9    at least 15 unauthorized access devices, which are --

10   which include stolen credit or debit card numbers, and

11   to possess them knowingly, and that's intentionally, and

12   with intent to defraud, meaning to use them to deceive

13   or cheat someone out of money.

14        Do you understand that?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  All right.  The third alleged

17   object of the conspiracy was to commit wire fraud.  Do

18   you understand that to prove wire fraud, the Government

19   would have to prove beyond a reasonable doubt, first, a

20   scheme substantially as charged in the indictment to

21   defraud or obtain money or property by means of false or

22   fraudulent pretenses; and second, a co-conspirator's,

23   including your knowing, and that means intentional and

24   willful, knowing it was illegal, participation in the

25   scheme with intent to defraud, meaning to cheat somebody

1    out of money; and third, the use of interstate or

2    foreign wire communications, and that means wire

3    communications going from one state to another or from

4    the United States to a foreign country.

5            Do you understand that?

6                THE DEFENDANT:  Yes, your Honor.

7                THE COURT:  The fourth alleged and alternative

8    goal of the conspiracy is aggravated identity theft in

9    violation of 18 United States Code, Section 1028(a),

10   knowingly transferring, possessing and using, without

11   lawful authority, a means of identification of other

12   persons, particularly credit and debit card account

13   numbers of individuals, during and in relation to the

14   commission of wire fraud, as I just described it.

15           Do you understand that to prove this crime, the

16   government would have to prove that a goal of the

17   conspiracy was to knowingly use -- and "knowingly" here

18   means intentionally and with knowledge that the means of

19   identification was -- it really belonged to another

20   person, it wasn't fictitious -- um, a means of

21   identification of another person, without lawful

22   authority, in connection with committing wire fraud as

23   I've described it.

24           Do you understand that?

25                THE DEFENDANT:  Yes, your Honor.

1            THE COURT:  Mr. Heymann, I may ask you for a

2    proposed instruction on Section 1956(a)(1) -- I'm sorry,

3    (a)(1)(B)(i), if it's necessary.

4         But the last alleged goal of the conspiracy is

5    money laundering in violation of 18 United States Code

6    Section 1956(a)(1)(B)(i) and (a)(2)(B)(i).

7         Do you understand that to prove a violation of

8    Section 1956(a)(1)(B)(i), the government would have to

9    prove beyond a reasonable doubt, first, that a -- that

10   the conspiracy was aimed to enter into a financial

11   transaction or transactions with a financial institution

12   engaged in interstate commerce -- and that's business

13   between one state and another; second, that the

14   transaction used the proceeds of unlawful activity;

15   third, that you, among others, knew that they were the

16   proceeds of some kind of crime that amounted to a state

17   or Federal felony; and fourth, that you knew the

18   transaction or transactions were designed, in whole or

19   in part, to conceal or disguise the nature, location,

20   source, ownership or control of the proceeds of that

21   criminal activity.

22        Do you understand that?

23            THE DEFENDANT:  Yes, your Honor.

24            THE COURT:  I think we can probably dispense

25   with the definition of the second alternative here.

1       Um, once again, did you read this information?

2           THE DEFENDANT:  I did, your Honor.

3           THE COURT:  And you see that it charges, in

4    Count 1, from approximately 2003 to 2008, in the

5    Southern District of Florida and the Southern District

6    of New York and the District of Massachusetts and

7    elsewhere, you, and others known and unknown to the U.S.

8    Attorney, did willfully, and that means intentionally

9    and knowing that it was illegal, conspire to commit the

10    crimes I just covered with you, unlawful access to

11    computers, access to device fraud, wire fraud,

12    aggravated identity theft, and money laundering as

13    described on Pages 1 through 3, and that at least one of

14    the co-conspirators committed one of the alleged overt

15    acts in furtherance of the conspiracy charged on Page

16    4.

17       Did you commit that crime of conspiracy?

18           THE DEFENDANT:  Um, yeah, I knew about this

19    stuff, this conspiracy, yes.

20           THE COURT:  Well, having in mind the -- what I

21    told you the government must prove, that you -- I mean,

22    did you knowingly and intentionally, knowing it was

23    illegal, agree to participate in a scheme with at least

24    one of these goals?

25           THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  And did you know that one of the

2   co-conspirators committed one of the overt acts listed

3   on Page 4, which include, for example, between November

4   21, 2005 and November 25, 2005, you, using ATM cards

5   linked to accounts in the names of fictitious and

6   unrelated individuals, to repatriate, get back to the

7   United States, $38,000 from Latvian bank accounts

8   specified by Albert Gonzalez, and that you sent the

9   proceeds, minus 10 percent, which you kept, to Gonzalez

10  in Miami.  Did you do that?

11         THE DEFENDANT:  Um, yes, but I -- this 38,000

12  I don't know about.

13         THE COURT:  All right.  But some amount of

14  money?

15         THE DEFENDANT:  Yes.

16         THE COURT:  All right.  Now listen while the

17  government summarizes what its evidence would have been

18  if this case went to trial against you and then I'll ask

19  you if you agree with the government's summary of what

20  you did.

21         MR. HEYMANN:  Your Honor, the government would

22  simply repeat what it said earlier to the Court by way

23  of facts.  If you'd like me to do so, I'm happy to do

24  so, or not.

25         THE COURT:  Well, do you have in mind what the

1   government told me earlier about the conspiracy and your

2   role in it?

3               THE DEFENDANT:  Yes, I recall what the

4   government said then.

5               THE COURT:  Okay.  And do you agree with what

6   the government told me?

7               THE DEFENDANT:  Yup.  Yes, your Honor.

8               THE COURT:  All right.  And how do you now

9   wish to plead to this one count against you, guilty or

10  not guilty?

11              THE DEFENDANT:  Guilty.

12              THE COURT:  Okay.  Then I'll direct the Clerk

13  to enter your plea of guilty because I find that you are

14  competent, you are acting knowingly and voluntarily, you

15  are effectively represented and there's an independent

16  basis in fact for your guilty plea.

17         You may take your seat back at the table.

18              THE DEFENDANT:  Thank you, your Honor.

19              (Is seated.)

20              THE COURT:  The Magistrate Judge, I

21  understand, has set the conditions of release.  I will

22  sign the waiver of indictment.

23              (Signs.)

24              THE COURT:  Unless somebody has a foreseeable

25  conflict, the sentencing will be on August 11 at

1    3:00 p.m.

2        If there's anything, except the information and

3    the presentence report, that anybody would like me to

4    consider, any motions, any memos, any letters, they

5    shall be filed by July 28th and responses shall be filed

6    by August 4.

7        Is there anything further in this matter for

8    today?

9            (Silence.)

10           THE COURT:  The Court is in recess.

11           (Ends, 5:15 p.m.)

12

13            C E R T I F I C A T E

14

15    I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
     hereby certify that the foregoing record is a true and
16   accurate transcription of my stenographic notes, on April
     28, 2009, before Chief Judge Mark L. Wolf, to the best of
17   my skill and ability.

18

19
     /s/ Richard H. Romanow 4-06-10
20   _____
     RICHARD H. ROMANOW  Date
21

22

23

24

25