1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                           No. 1:09-cr-10054-MLW-1

4

5
     UNITED STATES OF AMERICA
6

7    vs.

8
     HUMZA ZAMAN
9

10

11                       * * * * * * * * *

12

13                    For Hearing Before:
                   Chief Judge Mark L. Wolf

14

15                        Sentencing

16

17                   United States District Court
                     District of Massachusetts (Boston.)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   March 11, 2010

20

21                       * * * * * * * *

22

23                REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
                     United States District Court
24        One Courthouse Way, Room 5200, Boston, MA 02210
                       bulldog@richromanow.com
25

```
1                    A P P E A R A N C E S

2

3     STEPHEN P. HEYMANN, ESQ.
          United States Attorney's Office
4         John Joseph Moakley Federal Courthouse
          1 Courthouse Way, Suite 9200
5         Boston, MA 02210
          (617) 748-3100
6         Email: Stephen.heymann@usdoj.gov
          For the United States

7

8     PATRICK J. BRACKLEY, ESQ.
          Law Office of Patrick J. Brackley
9         233 Broadway, Suite 801
          New York, NY 10279
10        (212) 334-3736
          Email: Patrickbrackley@aol.com
11        For the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                  P R O C E E D I N G S
2             (Begins, 3:00 p.m.)
3             THE CLERK:  Criminal Matter 09-10054, the
4    United States versus Humza Zaman.  The Court is in
5    session.  You may be seated.
6             THE COURT:  Good afternoon.  Would counsel
7    please identify themselves for the Court and for the
8    record.
9             MR. HEYMANN:  Your Honor, Stephen Heymann on
10   behalf of the government.
11            MR. BRACKLEY:  Patrick Brackley for the
12   defendant, Mr. Zaman.  Good afternoon, Judge Wolf, sir.
13            THE COURT:  Good afternoon.
14       All right.  We're here today for Mr. Zaman's
15   sentencing.
16       Mr. Heymann, does the Government believe there are
17   identifiable victims who the law requires to be notified
18   of this proceeding?
19            MR. HEYMANN:  No, it does not, your Honor.
20   The nature of the defendant's conduct, in this
21   particular matter, was, um -- involved variants of money
22   laundering, but the government cannot link the
23   particular money that he was laundering to a particular
24   victim, and for that reason the government does not
25   believe that there are particular victims that are
```

1    required to be here today.

2            THE COURT:  Okay.  That was my understanding

3    from reading the presentence report.

4        This is a sentencing that was originally scheduled

5    for August of 2009.  In response to a joint motion to

6    continue it, I rescheduled the matter for February 10,

7    2010.  On February 8th, the defendant's attorney filed a

8    motion to continue that sentencing hearing because of

9    other matters on his schedule and stated that he would

10   be available any day of the week of March 8th, so

11   therefore I scheduled the sentencing for today.  Two

12   days ago, on March 9, I received another motion to

13   continue.  Yesterday, on March 10, the government

14   opposed that motion.  And yesterday, for reasons

15   described in my order, I denied that request.

16       Is there any impediment to proceeding today?

17           MR. BRACKLEY:  No, Judge, I'm happy to be

18   here, your Honor.  Thank you, sir.

19           THE COURT:  Okay.  I have the presentence

20   report as to which there are no objections from the

21   defendant.  I have the government's sentencing

22   memorandum.  I have a release letter reporting on the

23   defendant's compliance with his conditions of release,

24   that with regard to one matter dated March 10, 2010.

25       Is there anything else I should have received and

1    read?

2                MR. BRACKLEY:  No, your Honor.

3                MR. HEYMANN:  No, your Honor.

4                THE COURT:  Okay.  I'd like to try to assure

5    we have a common sense of the legal framework.  We're

6    operating under the Advisory Guideline System now in

7    effect.  That legal framework is succinctly described, I

8    believe, by the Supreme Court in *Gall*.

9         It instructs that "A district court should begin

10   all sentencing proceedings by correctly calculating the

11   applicable guideline range.  The guidelines should be

12   the starting point.  The guidelines are not the only

13   consideration, however.  After giving both parties an

14   opportunity to argue for whatever sentence they deem

15   appropriate, I must consider all of the Section 3553(a)

16   factors to determine whether they support the sentence

17   required by the parties.  I may not presume that the

18   guideline range is reasonable.  I must make an

19   individualized assessment based on the facts presented.

20   If I decide a departure or a variance is justified, a

21   major departure must be supported by a more significant

22   justification than a minor one, and I must explain the

23   reasons for the sentence I ultimately impose."

24        Do the parties agree that's a fair statement of

25   the legal framework?

1           MR. HEYMANN:  Yes, your Honor.

2           MR. BRACKLEY:  Yes, Judge.

3           THE COURT:  We're operating under the

4    guideline manual now in effect with the amendments

5    effective November 1, 2009.

6        Mr. Brackley, have you and Mr. Zaman each read the

7    presentence report?

8           MR. BRACKLEY:  Yes, Judge.

9           THE COURT:  And there are no objections.  But

10   is there anything that you or he feel is inaccurate?

11          MR. BRACKLEY:  No, Judge.

12          THE COURT:  And, Mr. Zaman, did you read the

13   presentence report?

14          THE DEFENDANT:  I did, your Honor.  Yes, sir.

15          THE COURT:  And is there anything in there you

16   feel is inaccurate?

17          THE DEFENDANT:  Um, the only thing is there is

18   a date for the state trial of like the 24th, I believe,

19   at the moment.

20          THE COURT:  Okay.  And this is for the

21   possession of the knife -- the alleged possession of the

22   knife?

23          THE DEFENDANT:  Right.

24          THE COURT:  And you're saying there is a date

25   for that event?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  I'll make a mental note of

3   that.  But I can tell you that, at this time, I don't

4   view the allegations concerning the knife to be what we

5   call "material."  I'm not going to take them into

6   account in deciding what the sentence should be.  It

7   doesn't affect the guideline range.  As far as I know,

8   the government's not basing its argument on it.

9          MR. HEYMANN:  Your Honor, the government

10  concurs completely that it has no bearing whatsoever on

11  the sentencing guidelines here or on the sentence that

12  the Court is going to consider for this offense.  To

13  whatever extent it has any bearing, it has on later

14  release issues, but nothing concerning the sentencing

15  itself.

16         THE COURT:  Okay.  So I'm going to impose the

17  sentence I would have imposed as if the knife -- that

18  information about the knife was not in the presentence

19  report.  Okay?

20         THE DEFENDANT:  Thank you, your Honor.

21         THE COURT:  All right.  So I believe that the

22  government's objections all resulted in corrections.

23  There's nothing on which I need to rule.  Is that

24  correct?

25         MR. HEYMANN:  Yes, that's correct, your Honor.

```
 1              THE COURT:  Therefore, as I understand it, the
 2   Total Offense Level is 23, the Criminal History Category
 3   is 1, the guidelines are 46 to 57 months in prison and
 4   24 to 36 months supervised release, a fine range of
 5   10,000 to 100,000 dollars, and a 100 dollar special
 6   assessment.
 7        Do the parties agree that those are the guideline
 8   ranges?
 9              MR. HEYMANN:  Yes, your Honor.
10              MR. BRACKLEY:  Yes, Judge.
11              THE COURT:  Okay.  What then is the
12   government's recommendation and what are the reasons for
13   it, please?
14              MR. HEYMANN:  Your Honor, the government's
15   recommendation is the low end of that guideline range,
16   which is 46 months incarceration, a 75,000 dollar fine
17   -- an amount intended to equal the approximate amount
18   that the defendant, um, was paid during the course of
19   the conspiracy, no restitution in light of 18 U.S.C.
20   Section 3663(a)(1)(B)(ii), the section that we actually
21   alluded to earlier, a 100 dollar special assessment, 3
22   years supervised release, and then as, um, a condition
23   of that supervised release, that the defendant, um, not
24   have access to third parties' identity or financial
25   records absent prior approval of his supervising
```

1  probation officer, and that, um, any employer that he

2  might be employed by during that period of supervision,

3  that, um, who would have access to that kind of

4  information, would be provided a copy of the indictment

5  in this case, to which he has pled guilty, so that the

6  employer could make a full and knowledgeable decision as

7  to what his view was as to whether or not he should have

8  access to it.

9           THE COURT:  Okay.  And what are the reasons

10 for the recommendation, please?

11          MR. HEYMANN:  I'm sorry, your Honor.  The

12 reasons for the recommendation are the following.  I

13 want to be -- Humza Zaman was part of an organization

14 that committed computer crimes and identity thefts on an

15 unprecedented scale.  Absolutely unprecedented.  The

16 government, um, has not alleged, nor does it want to

17 allege here that the defendant himself participated in

18 the hacking into the computer networks or participated

19 into the data theft itself, but he was fully

20 knowledgeable of what was going on.  He was intimate

21 friends of Steven Watt who prepared the program that was

22 used in --

23          THE COURT:  You mean he was "close" friends?

24          MR. HEYMANN:  Close friends.  Yes, close

25 friends.  He was close friends with Steven Watt.  He

1    was, as he pled guilty to and he did, in fact, do, he

2    sent, um, confidential records from his own employer

3    down to Albert Gonzalez to see whether Albert Gonzalez

4    could take advantage of those.  He knew what --

5              THE COURT:  This was Barclays -- he was

6    working at Barclays Bank in what capacity?

7              MR. HEYMANN:  As a -- in computer systems.  In

8    the security part of the computer systems.

9              THE COURT:  And he sent something called

10   "logs" of Barclays?

11             MR. HEYMANN:  Logs.  The computer keeps

12   records of what it's doing and the records are simply

13   called "logs," and he sent logs of ATM transactions that

14   the computer was keeping down to Albert Gonzalez to see

15   whether he could take advantage of those logs.  So he

16   knew what Albert Gonzalez was doing, he knew what the

17   organization was doing, but there's no allegation that

18   he, himself, was a perpetrator of one of the intrusions.

19         But that having been said, though, an organization

20   of this size, of this magnitude, does not function,

21   cannot function unless it can sell its goods, and once

22   it sells its goods, whether it can get its money and

23   distribute it and pay its people.

24         As the presentence report reflects, Christopher

25   Scott was paid somewhere between 300 and 500,000 dollars

1    in cash over time, Patrick Tuey received something less

2    than $100,000, the defendant received about $75,000.

3    The business functions for the purpose of getting cash

4    and needs cash and needs to get it back into the country

5    in a form that it can pay its people and profit from it,

6    and his role was critical in that regard.

7         So the government's recommendation of --

8              THE COURT:  So why don't you remind me of what

9    his role was?

10             MR. HEYMANN:  I'm sorry.

11             THE COURT:  I mean, I've read this, but --

12             MR. HEYMANN:  I'm sorry, your Honor.  What

13   happened here is the following.

14        Albert Gonzalez often required that he be paid

15   either in transfers to a bank account in Latvia, one or

16   more bank accounts in Latvia, or he be paid in web

17   currencies, virtual currencies that you can exchange

18   over the Internet.  Egold used to be one of them,

19   purportedly tied to a gold standard, which may or may

20   not have existed, but Egold used to be one of them.  Web

21   Money, out of Russia, is another one.  But these virtual

22   currencies or the Latvian bank accounts, while extremely

23   good for concealing the source origin of the proceeds of

24   this illegal activity, doesn't provide any cash that you

25   can spend in the United States.  And you've got to get

1    that back into the United States and you've got to, once

2    you get it back into the United States, you've got to

3    get it down to Albert Gonzalez.

4        So one thing the defendant did is Albert Gonzalez

5    gives him the name -- this is the first $38,000, gives

6    him some fictitious names belonging to fictitious or,

7    um, straw account holders in Latvia.  He goes to an ATM

8    in New York, pulls out $38,000, takes his cut, and sends

9    it down to Albert Gonzalez.

10       On another occasion, another group of occasions,

11   Albert Gonzalez manages to get the money available in

12   San Francisco.

13           THE COURT:  Well, let me ask you this.  Taking

14   it from the ATM, did that require any of the defendant's

15   computer expertise?

16           MR. HEYMANN:  It does not require -- it

17   requires him simply to have an ATM card with false

18   information on it, or an ATM card of somebody else's,

19   but it did not require his computer expertise, no.

20           THE COURT:  So somebody else gave him the

21   card?

22           MR. HEYMANN:  Somebody else gave him the card

23   or the card number, yes.  I guess the most candid way of

24   putting it is that I could do it.  If somebody gives me

25   the card number, I could go up to the machine and do

1  it.

2       Um, it was a big hunk of money and, as I said in

3  the description to the Court, I can only approximate it

4  because nobody has -- there are no critical records of

5  it, but this is three transactions of somewhere between

6  50 and $370,000 apiece.  We know of the $370,000 one

7  because, again, on a logged chat communication, we can

8  see Albert Gonzalez telling him that $375,000 is

9  available.  Um, he then flies out to San Francisco,

10  meets with somebody who is of foreign descent, gets

11  handed several hundred thousand dollars in cash, and

12  gets it back to Albert Gonzalez in a way that completely

13  protects Gonzalez from any linkage to the money.

14            THE COURT:  But gets it back -- so he's a

15  courier?

16            MR. HEYMANN:  He ships it back.  I mean, he's

17  -- he wasn't actually physically shipping it back, but

18  he is the courier in the transaction.

19            THE COURT:  But, again, he wasn't using his

20  expertise with computers to repatriate the money for the

21  United States?

22            MR. HEYMANN:  That's correct.  The only time

23  he ever uses his expertise with computers is the time

24  that the Court raised earlier about the Barclays system

25  logs, um, and that we do not have any evidence that

1    those Barclays system logs were ever, in fact, used in

2    an improper way.  But what they do evidence is his

3    knowledge of Albert Gonzalez and the activities that he

4    was involved in.  And the last thing that happens is, on

5    three occasions, each for something less than $100,000,

6    he meets with yet another stranger, on these occasions

7    in New York, again is given cash, and again sends it

8    down to Albert Gonzalez.

9         It's impossible to say with exact precision -- or

10   with precision -- well, I guess, "precision" is always

11   exact, um, how much that is.  The guideline range is

12   400,000 to a million.  There's no evidence that it went

13   over a million dollars.  Because we start with 38,000

14   and 370,000, so we know it's over 400,000, and the best

15   approximation is 6 to 800,000, roughly 700,000 in the

16   mail.

17                  THE COURT:  Okay.  Thank you.  Mr. Brackley.

18                  MR. BRACKLEY:  Yes, Judge.  As I think the

19   Assistant United States Attorney accurately

20   characterizes, Mr. Zaman, I think, found himself as a

21   gopher carrying money, ferrying money, which was

22   obviously the illegal proceeds of what we now know to be

23   a sprawling conspiracy, and I think, Judge, that your

24   questions as to what his role was are accurate in the

25   sense that he was on the foothold of becoming a much

1    more complex fraudster, if I think he had not been

2    arrested, is I think what Mr. Heymann was saying.

3    However, he was fortunately not given that opportunity.

4         But what I think the record will bear out is that

5    he, at the time, got himself involved with these

6    individuals who were living "the high life," as you

7    would say, a tremendous amount of drugs, every

8    recreational drug known to man --

9              THE COURT:  Well, where do I see that in the

10   record?

11             MR. BRACKLEY:  I think it's in the presentence

12   report, your Honor.

13             THE COURT:  I mean, I have a -- I mean, I do

14   have a report regarding his drug use in the period, but

15   I didn't see a nexus with Mr. Gonzalez or the others in

16   the presentence report, I don't think.

17             MR. BRACKLEY:  It's -- Mr. Zaman actually came

18   to meet his co-conspirators in hanging around in clubs

19   and using drugs and that is how he was ensnared into the

20   conspiracy.  Only then they became friends and

21   associates and then he began to use the opportunity to

22   commit crimes for them for whatever cash they would give

23   to him.  And I believe, Judge, as you're aware, this is

24   the first time that he's ever been arrested.

25        He, I believe, got into this conspiracy at a time

1   close to the death of his father.  He had been, as they

2   say, lost in the world and these individuals provided

3   him with some way to make easy money.  Um --

4               THE COURT:  He was making $130,000 a year at

5   Barclays.

6               MR. BRACKLEY:  That's correct.

7               THE COURT:  That's not, for most people, a

8   desperate financial situation.

9               MR. BRACKLEY:  That's correct, Judge, but it

10  was cash and it went along with the club scene that this

11  man found himself in with these individuals.  I think

12  that's how the money --

13              THE COURT:  All right.  Excuse me just one

14  second.

15              (Pause.)

16              THE COURT:  Go ahead.

17              MR. BRACKLEY:  Judge Wolf, I would also

18  request the low end in that this man did not involve

19  himself in any of the complicated computer

20  transactions.  That Barclays situation, I think, shows

21  that he was trying to do that, at some point, but

22  fortunately all of that was thwarted.  As the assistant

23  says, there's no evidence that that resulted in any

24  further loss or any further crime.

25          So I would ask, Judge, similarly for the low end

1    of that guideline range in that there's no substantial

2    aggravating factors here that would warrant an upward

3    departure in any regard.

4         THE COURT:  Mr. Zaman, you now have an

5    opportunity but not an obligation to speak before I

6    decide what sentence to impose.  That means you don't

7    have to say anything, if you don't want to, but if

8    there's something you would like to say, now is the

9    time.

10        THE DEFENDANT:  Um, I'm sorry, your Honor.

11   You're right.  You know, um, 130 was not really

12   desperate financial times.  I mean, looking back on it,

13   you know, just knowing that I'm probably not going to be

14   able to make that kind of cash income for the rest of my

15   life, whereas it is, you know, pretty much certain that,

16   even if I continue down the right path, it's definitely

17   something I will recognize every day now.  And I realize

18   there's no -- there's no real excuse for, you know, just

19   wanting to enhance your lifestyle to a level that you

20   don't really deserve even if, you know, the opportunity

21   definitely was too good to be true, um, in any real

22   sense.

23        And, um, I'm trying to, you know, like build some

24   semblance of a career and, you know, like -- you know,

25   it's been hard, you know, with all the add-on elements

1    that happen in your life when undergoing a situation

2    like this.  But I have, you know, I've been clean, as

3    far as my substance issues go, and I would just ask the

4    Court for, um, an opportunity to perhaps rebuild what

5    life I can.

6              THE COURT:  Well, let me ask you this.  Your

7    attorney asked me to give you the same sentence that the

8    government asked me to give you, 46 months.  Would you

9    ask me to give you a lower sentence than that?

10             THE DEFENDANT:  I would, your Honor, you know,

11   if it's possible.  I mean, incarceration seems a little

12   bit harsh to me.  Obviously it's not my call, but it

13   just -- you know, your Honor, I know what I did, um, is

14   pretty, um -- and, you know, the extent of the

15   guidelines are pretty scary, but, you know, I don't -- I

16   mean, I would just ask to, you know, um, to not be

17   incarcerated, if I can.

18             THE COURT:  All right.  And I had noticed from

19   the presentence report that you've been taking some

20   courses, I think, on financial planning through the

21   Harvard Extension School.  Is that right?

22             THE DEFENDANT:  Right.  Well, I finished that

23   one now and I'm hoping, in the summer, if I'm around, to

24   go full time there, because I've met the requirements

25   necessary for full-time enrollment there.

1          THE COURT:  Okay.  And am I right that you

2     haven't told your family or other people about the

3     charge against you?

4          THE DEFENDANT:  Well, I haven't told my mom

5     because, you know, she's like relatively recently

6     widowed and I would -- I mean, I'm just going to try not

7     to ever have her find out, to be honest, your Honor, um,

8     you know, if I can do it, even, whatever happens, you

9     know, as long as it doesn't, you know, like affect her.

10    And my sister and, you know, brother, you know, they --

11    it will get back to her.  I mean, some of my closest

12    friends do know.  I've called them pretty much.  But as

13    long as long as my mom -- well, it's a tough call

14    because, you know, it might be necessary for her to have

15    been prepped, depending on what my sentence is, but if

16    she finds out another way, um, how bad that could be.

17    But I think it's just a decision I kind of made to like

18    try to mask her from this as long as I humanly possibly

19    can.

20         THE COURT:  Thank you.  Here, let me just ask

21    you a couple of other things to make sure that I

22    understand.  You mentioned one.

23       You haven't tested positive for drugs while you've

24    been out on pretrial release, right?

25         THE DEFENDANT:  No, your Honor.

1              THE COURT:  And you've been able to do the

2    Harvard Extension School and start a couple -- try to

3    start a couple of businesses, is that right?

4              THE DEFENDANT:  Basically, yes, your Honor.

5              THE COURT:  All right.  And you certainly seem

6    to understand what I've said today and you've responded

7    to it.

8         You do understand what's going on here today?

9              THE DEFENDANT:  Um, yeah.  Yes, sir.

10             THE COURT:  And have you talked to

11   Mr. Brackley in preparation for the sentencing today?

12             THE DEFENDANT:  I mean, yeah, right before it,

13   we spoke briefly.  Yes, your Honor.

14             THE COURT:  Okay.  You may seated for a

15   moment.

16             THE DEFENDANT:  Thank you.

17             (Is seated.)

18             THE COURT:  All right.  Mr. Zaman, please

19   stand.

20             (Defendant stands.)

21             THE COURT:  In connection with the one count

22   to which you've pled guilty, I hereby sentence you to

23   serve 46 months in the custody of the Attorney General

24   of the United States to be followed by 3 years of

25   supervised release on the standard conditions and --

1    which include that you do not commit another crime, that

2    you provide a DNA sample, and the following special

3    conditions:

4         You may not possess a firearm or other dangerous

5    weapon, including a knife.  You must pay a 75,000 dollar

6    fine on a schedule that I will determine.  You may not

7    have access to any third-party identification issue or

8    financial records without the express approval, in

9    advance, of Probation.

10        You must inform any potential employer of the

11   charges and conviction against you and if you're seeking

12   any position involving finance, you must not incur any

13   new credit charges or open any additional lines of

14   credit without the approval of the Probation Office as

15   long as any of your financial obligations are

16   outstanding.  You must provide the Probation Office

17   access to any requested financial information which may

18   be shared with the United States Attorney.

19        You must participate in a program for drug testing

20   and treatment, as prescribed by Probation, which can

21   include up to 104 tests a year.  If you have the funds

22   or the insurance to pay or contribute to the cost, you

23   must pay or contribute to the cost of that treatment.

24   There's also a mandatory 100 dollar special assessment.

25        In your plea agreement, you've waived your right

1   to appeal except with regard to any legally-incorrect

2   guideline calculation.  There's been no objection to the

3   guideline calculation, but if you want to appeal on that

4   basis and you cannot afford a lawyer, one will be

5   appointed to represent you at public expense.

6       What I've done is give you the sentence that I

7   find is sufficient and no more than necessary to serve

8   the statutory goals of sentencing.  And while maybe some

9   additional arguments could have been made on your

10  behalf, I don't imagine, based on the information I

11  have, how they would have altered the sentence.  I

12  actually thought of giving you a higher sentence because

13  -- and I think the statute provides the framework for

14  explaining this and I'm going to explain to you why I

15  think that those 46 months are the minimum necessary to

16  serve the purposes that a sentence is required to serve.

17      I've had to consider your personal history and

18  characteristics.  And I regularly sentence people who

19  come from very difficult backgrounds or who have mental

20  illnesses, and that's not you.  A look at the

21  presentence report tells me that you were born into a

22  fine family, that you were blessed with real

23  intelligence, that you had the highest SATs, I think, in

24  your high school in New York, that you got the

25  opportunity to leave high school and go to college

```
1    early, but that you ended up back in high school because
2    of drug use, if I read it correctly.  But you're an
3    intelligent person who was raised in a family that
4    didn't abuse you.
5         You had progressively more responsible jobs that
6    paid you better and better.  You know, it looks like, in
7    five to six years, you went from making about $30,000 to
8    making $130,000.  You were very adept with computers.
9    You had a good future.  And the history -- the nature
10   and circumstances of the offense is you voluntarily got
11   in with people that you knew were swindlers on a huge
12   scale and simply for greed, as far as I can see, decided
13   to try to help them succeed.  And here you've been
14   punished for being the courier, but, you know, you took
15   confidential information of your employer, Barclays
16   Bank, and gave it to Mr. Gonzalez and asked him if he
17   could find some criminal use for it.  This doesn't
18   demonstrate any kind of reluctance.
19        The sentence has to recognize the seriousness of
20   the offense and your guidelines haven't been calculated,
21   your sentence hasn't been decided based on the huge
22   scope of the international fraud, but moving money
23   around was an important part of it and you moved a lot,
24   and you didn't do it just once, you did it several times
25   and you did it for the most conventional of motives, as
```

1  far as I can tell, greed.

2       The sentence has to be sufficient to send two

3  kinds of messages and one is to you, that this is

4  serious and you'd better not do it again.  It also needs

5  to send a message to other people like you, similarly

6  situated to the way you were several years ago, you

7  know, to people who may be bright, who may have

8  responsible positions, but who may want even more and

9  have attempted to engage in illegal conduct to get more

10 money.  The sentence needs to send the message that

11 that's not just wrong, but it's dumb.  You'll get

12 caught.  You'll get convicted.  You'll get seriously

13 punished.  And to the extent that the sentence sends a

14 deterrent message to you, it will protect the public in

15 the future.

16      I don't find that you need any vocational training

17 or medical care, but I will recommend that you be

18 offered drug treatment while you're in prison.  I think

19 you've been doing a good job, the last couple of years,

20 and it shows you have discipline, as well as

21 intelligence, but up until now, not wisdom.  But I want

22 that drug treatment to be available to you in prison as

23 well as when you get out of prison.

24      And I've given some thought to the guidelines and

25 they describe, um, what the Sentencing Commission thinks

should usually be the range for a person like you who
did what you did, and sometimes I give a lower sentence,
but I just don't see a good reason to give a lower
sentence here.  Sometimes I even give higher sentences
and I think a higher sentence would be reasonable, but
the sentence that I've given you should be sufficient
and therefore I'm not imposing a higher sentence.

When you get out, you'll be under the supervision
of the Probation Department for 3 years and it's going
to be important that you continue to work with
Probation, as you've worked with Pretrial Services, and
that you behave.

I've proposed a $75,000 fine because that seems to
be roughly what you made from this and I think you have
the potential to honestly earn money in the future,
although your opportunities will be injured by this
conviction.  You know, you earned that money, so you're
going to have to pay that fine.

You'll be on supervised release, as I said, for 3
years.  If you commit any further crimes, you'll get
caught, you can get brought back in front of me, you can
be locked up for 3 more years in this case, and then
you'll be prosecuted for whatever caused you to have
your supervised release revoked here.  So I hope, for
your sake, really, that this sentence will serve its

1  purpose.

2      You had an opportunity to go to college at an

3  young age and you were immature and you apparently

4  abused drugs and you lost that chance.  You had an

5  opportunity for a fine career in a growing field,

6  technology, and you weren't satisfied with that,

7  previously.  So when you have to start all over again, I

8  hope you'll be determined to use your intelligence and

9  your energy only for honest purposes and I hope that you

10  succeed.  You may be seated.

11          (Defendant is seated.)

12          THE COURT:  Now, there's a question as to

13  whether the defendant should begin serving his sentence

14  today or whether he wishes to request an opportunity to

15  self report.

16          MR. BRACKLEY:  Judge, I would respectfully

17  request the opportunity that he self report.

18          THE COURT:  What's the government's view on

19  that?

20          MR. HEYMANN:  Your Honor, if I could take that

21  in two parts.  The Government has no evidence and sees

22  no evidence of his being a danger to the community right

23  now, you know, that the -- either for his previous

24  offenses here or in any allegations that have occurred

25  over the past several months.  Um, the government is

1    concerned, however, that he has not told any family

2    members, that he has no apparent ties to hold him in

3    place, and that he's now facing a lengthy sentence, and

4    under those circumstances it's difficult to conclude, by

5    clear and convincing evidence, that he's not a

6    likelihood of flight.  It's that second prong that

7    causes the government pause.

8              THE COURT:  Well --

9              MR. HEYMANN:  But, to be clear, he has

10   otherwise not -- he has appeared here today and has not

11   otherwise violated any of his conditions.

12             THE COURT:  My question to you is not

13   rhetorical.  I don't know that -- I haven't thought

14   through what the standard for being released pending

15   appeal applies because I don't -- because it appears to

16   me, although it may not ultimately be up to me, that

17   he's waived his right to appeal and usually the question

18   on self-reporting doesn't get analyzed in that

19   framework, but perhaps it should.

20        But I guess that's the -- and I'll actually say

21   the following.  The motion that Mr. Brackley filed to

22   continue talked about the defendant needing drug

23   treatment or maybe mental health counseling, and I know

24   that this is stressful.  I asked the Pretrial Services

25   to check with Pretrial Services in New York.  They tell

me, um, what's been confirmed by the defendant today,

that he's been complying with the conditions of his

release other than that state court case that will have

to be resolved.  He's been drug tested about three times

a month and he's never tested positive for narcotics.

I've been alert to whether there was any question

about his competence.  The discussion he had with me

shows that he understands what's going on.  He was able

to express himself very well, although he didn't

persuade me not to put him in prison.  But I guess that

is the question, Mr. Brackley, and it's possible that

Mr. Zaman should speak to it.

Although he has obeyed the conditions of his

release up till now, why should I be comfortable that if

I give him a month to self report or something like

that, he's not going to take off?

MR. BRACKLEY:  Judge, his conduct, in all

respects, is -- he has been under stress, there's no

question about it, but even the reporting of the other

arrest, his appearances in court on that matter, and I

believe, Judge, his desire to see this thing through, as

he has even until today, that I don't believe he's any

flight risk, Judge.

There is a concern with his family.  I have spoken

to him about that at great length.  Of course, though,

1  we were not in a position to have letters from his

2  family or some of his close friends, as usually you

3  would see, and it was an odd kind of a situation.

4         THE COURT:  Well, let me see if I understand

5  that.  In other words, you didn't overlook the

6  possibility of getting letters from his family, but

7  you're telling me that he asked you not to let his

8  family know what's going on?

9         MR. BRACKLEY:  From the very beginning, your

10  Honor, that's correct, and for the reasons that he

11  stated to your Honor, that he just did not want to bring

12  the shame upon himself to his family.

13         THE COURT:  And that's helpful because, you

14  know, usually, or often there would be letters like

15  that, but now I know that -- well, Mr. Zaman, do you

16  agree with what Mr. Brackley just told me?

17         THE DEFENDANT:  Yeah.  Um, I didn't think

18  about my friends, though, for character witnesses and

19  stuff.  I could have gotten that for sure.  And if -- I

20  basically will appreciate -- I mean, I'm looking at a

21  long sentence and the month will really let me sort out

22  things like, you know, my possessions and, you know,

23  maybe even I'll have to, you know, explain to my family

24  why I'm going to be away for almost four years.

25         THE COURT:  All right.  You're not on

1    electronic monitoring now, are you?

2              THE DEFENDANT:  No.

3              THE COURT:  I'm -- do you understand that if I

4    let you go for about a month and let you self report and

5    you take off, it's very likely you're going to get

6    caught?

7              THE DEFENDANT:  I do understand, your Honor.

8              THE COURT:  And when you get caught, you'll

9    probably get a couple of extra years for that?

10             THE DEFENDANT:  Yes, your Honor.

11             (Pause.)

12             THE COURT:  All right.  Today is Thursday.

13   Are you prepared to -- where do you live now, in New

14   York City?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  Do you have a telephone?

17             THE DEFENDANT:  Um, I have one at home and I

18   have one checked in downstairs.

19             THE COURT:  Okay.  But do you have a land-line

20   phone at home?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  So presumably if I ordered him to

23   be put on electronic monitoring, that could be

24   implemented, Mr. Cronin?

25             PROBATION OFFICER:  Yes, your Honor.

```
 1              MR. BRACKLEY:  Judge, just one last request.
 2      As to the drug program, and I don't know if you said it,
 3      but would there be a specific recommendation for the
 4      500-hour program?
 5              THE COURT:  If he's eligible for it and I
 6      think the sentence is long enough.
 7          Do you want drug treatment while you're in
 8      prison?
 9              THE DEFENDANT:  Yes, your Honor.
10              (Pause.)
11              THE COURT:  All right.  Mr. Heymann, I'm
12      inclined to let the defendant self report on April 12th
13      to the institution designated by the Attorney General,
14      to permit him to return to New York, to reside in his
15      apartment, on electronic monitoring, and Pretrial -- I
16      think it's Probation, I guess, it would be at this
17      point.
18              PRETRIAL OFFICER:  It would still be Pretrial
19      Services.
20              THE COURT:  And Pretrial Services can
21      authorize him to go out for specific reasons at specific
22      times, but you can only be out at times that are
23      approved in advance by Pretrial Services, unless you
24      have a medical emergency or something like that.  Do you
25      understand that?
```

```
 1              THE DEFENDANT:  So I wouldn't be able to like,
 2    um -- I wouldn't be able to run errands and stuff?
 3              THE COURT:  Yeah, you wouldn't be able to run
 4    errands unless you talk to Probation in advance.
 5              THE DEFENDANT:  About what exactly I'm doing?
 6              THE COURT:  Yeah, and if they authorize it.
 7    And then you can only go where they tell you you can go.
 8              THE DEFENDANT:  So basically I'll be under
 9    house arrest?
10              THE COURT:  Yes, except when they authorize
11    you to go out.
12              THE DEFENDANT:  Okay.  I understand, your
13    Honor.
14              THE COURT:  The alternative is I've got the
15    marshal here.
16              THE DEFENDANT:  I know you do.  Yes, your
17    Honor.
18              THE COURT:  The other point is if you're gone
19    when you're not authorized to be gone, if it turns out
20    that you're -- well, just listen -- that you've gone
21    someplace that you're not authorized to go, they'll be
22    under the direction to take you into custody
23    immediately.  Do you understand that?
24              THE DEFENDANT:  Yes, your Honor.
25              THE COURT:  All right.  Unless -- does the
```

1  government want to be heard further on this?

2          MR. HEYMANN:  No, your Honor.

3          THE COURT:  I think, in view of Mr. Zaman's

4  good performance on supervised -- on pretrial release,

5  that I'm persuaded that he's capable of obeying and

6  while there are reasons, stated by the government, that

7  I can't be -- that I can't feel guaranteed that he'll

8  report when he should report, when he must report, I'm

9  reasonably assured that he'll do it.  And he's going to

10 be on electronic monitoring.  If he's gone, Pretrial

11 Services will know about it promptly.  They're ordered

12 to let me know immediately.  And they'll be further dire

13 consequences.

14      So the defendant's release shall continue until

15 April 12th, 2010, when he shall report to the

16 institution designated by the Attorney General of the

17 United States.  I will recommend that he be offered the

18 500-hour drug treatment program.  His release will be on

19 the standard conditions and on the additional conditions

20 that he remain at home, subject to electronic

21 monitoring, to be established tomorrow.

22      You're to return to New York today and, if at all

23 possible, the electronic monitoring is to be established

24 tomorrow, and if not, I assume no later than Monday, and

25 I want to be informed when it's operative.  And

1    Mr. Zaman shall stay in his residence except at times

2    when he's authorized by Pretrial Services to go out to

3    essentially arrange his affairs or for religious or

4    medical reasons.  And, again, I'm directing Pretrial

5    Services to inform me promptly if Mr. Zaman violates the

6    conditions of his release.

7         The previously-imposed drug testing and treatment

8    requirements and reporting requirements will remain in

9    effect.

10             MR. BRACKLEY:  Judge, for incarceration, would

11   it be proper to make a request for a specific housing

12   detention facility, would you entertain such a request?

13             THE COURT:  Well, generally speaking, it's my

14   understanding that the Bureau of Prisons will place the

15   defendant in the facility with the proper designation

16   level that has space and is nearest to his home.  So

17   except in extraordinary or very unusual circumstances, I

18   don't make a specific recommendation.  But what

19   recommendation would you propose?

20             MR. BRACKLEY:  There's a facility in

21   Morgantown, West Virginia that I have an understanding

22   has an exceptional program with respect to substance

23   abuse and individuals who have gone there have had much

24   success under those conditions.

25             THE COURT:  Well, you and Mr. Zaman can

 1   communicate with Probation and particularly with the

 2   Bureau of Prisons.  You can make that request.  But I'm

 3   not making that recommendation for two reasons.  One,

 4   that's really the responsibility of the Bureau of

 5   Prisons.  Two, I think all of the facilities to which he

 6   might be designated will have drug treatment programs.

 7   And, three, while I don't suggest he doesn't still have

 8   a drug problem, he's done a good job over the last

 9   couple of years.  And, in fact, if he hadn't, he'd be

10   going out with the marshals today.

11        So this is up to you, Mr. Zaman.  You're not a

12   little boy.  I know this is hard for you to explain to

13   your family, but you're going to be gone for close to

14   four years and I did want to give you an opportunity to

15   try to handle this in the best way possible.

16             THE DEFENDANT:  Thank you, your Honor.

17             THE COURT:  All right.  Is there anything

18   further in this matter for today?

19             MR. HEYMANN:  No, your Honor.

20             THE COURT:  The Court is in recess.

21             (Ends, 4:00 p.m.)

1               C E R T I F I C A T E

2

3

4

5        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
   hereby certify that the foregoing record is a true and
6  accurate transcription of my stenographic notes, on March
   11, 2010, before Chief Judge Mark L. Wolf, to the best of
7  my skill and ability.

8

9

10

11 /s/ Richard H. Romanow 04-06-10
   _____
12 RICHARD H. ROMANOW  Date

13

14

15

16

17

18

19

20

21

22

23

24

25